## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CIVIL CASE NO.:

| | |
|---|---|
| JOHN LAING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BP, P.L.C.; BP EXPLORATION & | ) |
| PRODUCTION,INC.; BP PRODUCTS | ) |
| NORTH AMERICA, INC.; | ) |
| BP AMERICA, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff, JOHN LAING (hereinafter "Plaintiff"), by and through his undersigned counsel, and hereby sues the Defendants, BP, P.L.C.; BP EXPLORATION &  PRODUCTION,INC.; BP PRODUCTS NORTH AMERICA, INC.; BP AMERICA, INC. (collectively "Defendants"), and alleges the following:

### Jurisdiction and Venue

1.      This action is authorized under 33 U.S.C. Sections 2701(3) & 2713 (2012), of the Oil Pollution Act to redress damages resulting from BP's misappropriation and misuse of Plaintiff's design which was implemented in containing the Deepwater Horizon oil leak.

2.      Jurisdiction is also proper pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000, exclusive of interests and costs, and the parties are citizens of different states.

1

3.      This Court has supplemental jurisdiction over all claims raised herein pursuant to 28 USC § 1367.

4.      Defendant's minimum contacts with Hillsborough County, Florida are sufficient to subject it to the personal jurisdiction requirements of <u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945).

5.      At all times material hereto, BP, Inc., et al, was a foreign for profit corporation conducting business in Hillsborough County, Florida

6.      At all times material hereto, John Laing was a resident of Hillsborough County, Florida.

7.      Plaintiff's design for the oil containment device, subject to this action, was created in Hillsborough County, Florida.

8.      Venue for this action is therefore proper under 28 U.S.C. § 1391.

**<u>Factual Allegations</u>**

9.      Plaintiff re-alleges and incorporates paragraphs 1-8 above as if fully set forth herein.

10.      BP was the owner of a of lease allowing it to drill for oil and perform oil production and related operations on the *Deepwater Horizon* oil platform located off the coast of Louisiana.

11.      On or about April 20, 2010, an explosion occurred on the *Deepwater Horizon* oil drill platform which, at the time, was operated by BP.

12.      As a result of abovementioned explosion in paragraph 9, crude oil leaked from the oil well drilled by the *Deepwater Horizon* at a rate estimated at approximately 5,000 barrels (210,000 gallons) per day for 152 days.

13.     On or about April 28, 2010, U.S. Coast Guard's National Pollution Funds Center sent Notice of Designation to BP and Transocean identifying them as responsible parties.

14.     On or about April 29, 2010, The Department of Homeland Security designated the oil spill as a nationally significant event enabling funding at the national level.

15.     On or about May 7, 2010, BP made its first attempt to repair the damaged oil well and prevent further seepage using a "containment box", however this procedure proved unsuccessful.

16.     On or about May 11, 2010, BP made its second attempt to repair the damaged well using a "top hat containment box", however this procedure was also unsuccessful.

17.     Thereafter, Plaintiff, John Laing, began developing a design (attached as exhibit "A") that ultimately would be used by BP in containing the oil leak.

18.     On or about May 13, 2010, BP stated in an SEC filing that the clean-up costs were estimated at $450 million, with the number potentially growing higher.

19.     On or about May 15, 2010, BP, in its third attempt to repair the well, connected an "insertion tube" onto the well head, which diverted oil to a collection ship at the surface. This procedure was minimally successful, reducing the estimated daily oil flow rate by only twenty percent.

20.     On or about May 26, 2010, BP made another attempt to repair the damaged oil well using a "top kill" procedure, however this procedure also proved minimally successful and oil continued to seep from the well at an alarming rate.

21.     Thereafter, John Laing submitted his oil containment design, together with a letter explaining how the design worked (attached as exhibit "B"), to Lieutenant Commander Kevin Carroll of the United States Coast Guard, who oversaw the BP clean-up efforts, with the primary

purpose of entering into a business relationship or agreement with BP, the U.S. government or both.

22.     At all times pertinent hereto, John Laing expected to be compensated by BP and/or the United States if his design had been used.

23.     Commander Carroll was, at all times pertinent hereto, employed by or an agent of the United States in its Coast Guard's Chief Inspections Division located at 155 Columbia Dr., Tampa, Florida 33606.

24.     Shortly after submitting his design to Commander Carroll, Plaintiff personally met with Commander Carroll to discuss the details of the design, specifically they discussed how the design would cap the damaged well and stop the flow of oil.

25.     Thereafter, Mr. Laing recorded a video presentation demonstrating the functionality of the design and forwarded same to Commander Carroll together with a letter providing specific instructions on implementation (attached as exhibit "C").

26.     On or about June, 3 2010, BP installed a "riser cap", which proved minimally successful, only cutting off a fraction of the oil flow.

27.     On June 12, 2010, BP announced that, to date, it has collected approximately twenty-five to thirty-three percent of the total amount of oil released. Unsatisfied with these results, the on-site federal coordinator gave BP 48 hours to come up with more spill containment resources.

28.     Shortly after the announcement referenced in paragraph 25 above, Commander Carroll forwarded Plaintiff's design and supporting documents to BP's Deepwater Horizon engineering division.

4

29.    On June 28, 2010, BP's Deep Water Horizon's Support Team sent an email to Plaintiff acknowledging receipt, review and rejection of his design. (See exhibit "D")

30.    BP was aware that Plaintiff created the design mentioned in paragraph 26 above and also knew or reasonably should have known that Plaintiff expected compensation in return if BP decided to use it to repair the oil well.

31.    In August 2010, BP announced it utilized a new containment device to cap the well and was monitoring its effectiveness. In September 2010, BP announced this effort was successful and the containment device had topped the leak.

32.    Shortly thereafter, Plaintiff obtained and reviewed the design used by BP that successfully contained the leak and noticed that it was nearly identical to the one he submitted.

33.    Plaintiff then retained Curry Law Group (Curry Law) to represent him in this matter.

34.    On February 18, 2011, Curry Law sent a demand letter to the Chairman of BP America, Lamar McKay, requesting compensation for the development and plans that Plaintiff submitted which ultimately were utilized to contain the flow of oil from the Deepwater Horizon well. (See exhibit "E")

35.    In response, BP patent attorney Jayne Piana, sent a letter dated May 26, 2011, acknowledging receipt and review of Plaintiff's design and further stated that BP did not implement his proposal.

36.    On June 24, 2011, Plaintiff filed an application for a patent with the U.S. Patent and Trademark Office and was assigned Serial Number 61500821.

37.    On January 18, 2013, Plaintiff filed a "presentment" with BP's Claims Program as required under the Oil Pollution Act. 33 U.S.C. Sections 2701(3) & 2713 (2012), demanding

$146,186,315 for using Plaintiff's design in stopping the oil leak. Therefore, the condition precedent for filing this claim has been satisfied. (See exhibit "F").

## Count I
## Unjust Enrichment

38.     Plaintiff re-alleges and incorporates paragraphs 1-37 above as if fully set forth herein.

39.     The elements for unjust enrichment are: (1) the plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) the defendant has voluntarily accepted and retained the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff.

40.     Plaintiff presented an oil containment design to BP that it utilized in repairing the oil leak which resulted in cost savings to BP.

41.     Defendant has refused to pay Plaintiff for the use of his design.

42.     Therefore, it would be inequitable for the Defendant to retain the benefit of using his design without paying for it.

**WHEREFORE** Plaintiff demands judgment against Defendant, BP, et al., for equitable relief and remuneration as authorized by law, and such other and further relief as this court deems just and proper, and hereby demands trial by jury on all issues triable as of right by jury.

## Count II
## Violation of Florida's Deceptive and Unfair Trade Practices Act (FDUPTA)

43.     Plaintiff re-alleges and incorporates paragraphs 1-37 above as if fully set forth herein.

44.     Section 501.204(1) of FDUTPA prohibits Defendants from engaging in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

45.     Plaintiff is a consumer, and Defendants at all material times have engaged in "trade or commerce" as defined in § 501.203, Fla. Stat., of FDUTPA.

46.     A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.

47.     Misappropriation of a business idea, without compensating the creator of the idea, is considered a deceptive act under FDUPTA. Career Fairs.com v. United Business Media, 838 F. Supp. 2d 1316 (SD Fla. 2011).

48.     Plaintiff presented his business idea (the oil containment design) to BP, who in turn misappropriated the idea for their own benefit and refused to compensate Plaintiff.

49.     Defendant acted in bad faith by implementing Plaintiff's design for their own benefit, without Plaintiff's consent, and then lying to Plaintiff denying the fact they used his design.

50.     Defendant has engaged in representations, omissions, acts or practices which are material and are likely to mislead similarly situated consumers acting reasonably. Thus, Defendant has engaged in deceptive acts or practices under § 501.204(1) of FDUTPA.

51.     Defendants have engaged in acts or practices that are procedurally and substantively unconscionable. Thus, Defendants have engaged in unconscionable acts or practices under § 501.204(1) of FDUTPA.

52.     Plaintiff has suffered damages as a direct and proximate result of Defendant's violations of FDUTPA.

**WHEREFORE**, the Plaintiff, John Laing, demands judgment against Defendant for damages, costs, and attorneys fees and all other proper relief and hereby demands trial by jury as to all issues so triable by jury.

## Count III
## Violation of Florida's Uniform Trade Secrets Act (FUTSA)

53.     Plaintiff re-alleges and incorporates paragraphs 1-37 above as if fully set forth herein.

54.     The Plaintiff's design was a secret as defined under § 688.002(4), Fla. Stat., for the following reasons:

      a.     No one outside of Plaintiff's company and those close to Plaintiff including his employees knew about Plaintiff's design prior to initially disclosing it to Commander Kevin Carroll.

      b.     Plaintiff took measures to guard the secrecy of his design by only disclosing it to Commander Kevin Carroll, acting in his governmental capacity, and BP for the purposes of entering into a business relationship.

      c.     The design is extraordinarily valuable as it was unique and not readily ascertainable by proper means, in addition it was eventually used to contain the oil leak saving BP several millions of dollars.

      d.     Plaintiff spent effort, time and money in developing the design. He had difficulty in figuring out the precise measurements and ratios to obtain the desired result.

      e.     The design would be difficult to duplicate by others without Plaintiff's specifications.

55.     Plaintiff presented his trade secret (the oil containment design) to Commander Kevin Carroll, who in turn presented it to BP's engineering department. BP then misappropriated the secret for their own benefit without the express or implied consent by Plaintiff and further refused to compensate Plaintiff after demand was made.

56.     At the time of disclosure, BP knew or had reason to know that Plaintiff's design was a trade secret and that it acquired Plaintiff's design under circumstances giving rise to a duty to maintain its secrecy or limit its use.

57.     Plaintiff has suffered damages as a direct and proximate result of Defendant's violations of FUTSA.

**WHEREFORE**, the Plaintiff, John Laing, demands judgment against Defendant for damages, costs, and attorneys fees and all other proper relief and hereby demands trial by jury as to all issues so triable by jury.

### Count IV
### Fraudulent Misrepresentation

58.     Plaintiff re-alleges and incorporates paragraphs 1-37 above as if fully set forth herein.

59.     BP's letter to Plaintiff denying use of Plaintiff's design is a material fact that BP knew was false, and this letter was intended to induce Client to act (or not act) on the misrepresentations contained therein by attempting to persuade Client that his design was not used.

60.     Defendant knew their denials were false at the time it was made.

61.     The false statements were fact, not opinion.

62.     Plaintiff relied on those false representations.

63.     Plaintiff has suffered damages as a direct and proximate result of Defendant's fraudulent misrepresentations.

**WHEREFORE**, the Plaintiff, John Laing, demands judgment against Defendant for damages, costs, and attorneys fees and all other proper relief and hereby demands trial by jury as to all issues so triable by jury.

**Count V**
**<u>Breach of Confidential (Fiduciary) Relationship</u>**

64.     Plaintiff re-alleges and incorporates paragraphs 1-37 above as if fully set forth herein.

65.     Plaintiff placed special confidence in Defendant to act in good faith and not misappropriate his design and use it for its own benefit without Plaintiff's consent.

66.     BP was in a position of superior bargaining power in relation to Plaintiff.

67.     By the foregoing, BP owed a fiduciary duty to Plaintiff to act in good faith and deal fairly with Plaintiff.

68.     BP breached its duty by misappropriating Plaintiff's design for its own use without compensating Plaintiff, and then lied to Plaintiff that BP did not use his design in repairing the well, when in fact it did.

69.     Plaintiff has suffered damages as a direct and proximate result of Defendant's breach of fiduciary duty.

**WHEREFORE**, the Plaintiff, John Laing, demands judgment against Defendant for damages, costs, and attorneys fees and all other proper relief and hereby demands trial by jury as to all issues so triable by jury.

## Count VI
## <u>Civil Theft</u>

70.     Plaintiff re-alleges and incorporates paragraphs 1-37 above as if fully set forth herein.

71.     This is an action for civil theft under § 772.11 Fla. Stat.

72.     All conditions precedent to this action have occurred.

73.     Thirty (30) days has elapsed since the Statutory Demand without any payment of the theft amounts to any of the Plaintiffs.

74.     Defendant, BP, knowingly obtained or used, or endeavored to obtain or use, with felonious intent to permanently or temporarily deprive Plaintiff of their right to or benefit from their property by misappropriating Plaintiff's design for Defendant's own benefit in violation of Section 812.014(1), Florida Statutes.

75.     Plaintiff can prove by "clear and convincing" evidence that he was injured by reason of a violation of the provisions of Florida Statute §812.014, Grand Theft.

76.     Plaintiff has suffered damages as a direct and proximate result of Defendant's theft.

77.     Plaintiff has had to retain the services of undersigned counsel for this action, and is entitled to recover all damages listed above, including treble damages for his losses and reasonable attorneys' fees and costs pursuant to F.S.772.11.

**WHEREFORE**, the Plaintiff, John Laing, demands judgment for treble damages, reasonable attorney fees, costs and interest against the Defendant and all other proper relief and hereby demands trial by jury as to all issues so triable by jury.

## Count VII
## Conversion

78.    Plaintiff re-alleges and incorporates paragraphs 1-37 above as if fully set forth herein.

79.    At all times material hereto, the Defendant knowingly converted money from the Plaintiff by misappropriating his design with the intent to either temporarily or permanently deprive Plaintiff of a useful right to the property and to appropriate the property for their own use.

80.    Defendant wrongfully asserting dominion over Plaintiff's design, which was illegal and inconsistent with Plaintiff's possessory rights in that personal property; demand for the return of the property in the form of compensation was made and Defendants refused to compensate.

81.    Plaintiff has suffered damages as a direct and proximate result of Defendant's conversion.

**WHEREFORE**, the Plaintiff, John Laing, demands judgment for damages, reasonable attorney fees, costs and interest against the Defendant and all other proper relief and hereby demands trial by jury as to all issues so triable by jury.

## **Demand for Jury Trial**

The Plaintiff, John Laing, demands a trial by jury on all issues so triable.

CURRY LAW GROUP, P.A.

BY:  __/s/_ CLIFTON C. CURRY, JR
CLIFTON C. CURRY, JR., ESQUIRE
CCCService@currylawgroup.com
Florida Bar No. 0338915
LOUIS D. LAZARO, ESQUIRE
LDLService@currylawgroup.com
Florida Bar No: 0116378
Attorneys for John Laing
Copy to: TaraM.Carroll@currylawgroup.com
P.O. Box 1143
Brandon, Florida 33509-1143
(813) 653-2500 /tmc



# Simple Solution

## 1. Insertion pipe.

The first part of the "simple solution" is to insert the tapered pipe into the preventer. This will be tapered from 18-19" up to existing pipe (21"). This is the "tapered fit" section. This will have a hypodermic needle type end at around 60 degrees angle. This will be fully open at all times.

This will be inserted as far as possible into the preventer. BP should know this length. The best case would be 21' into the well. We can do it with much less. *Additional reinforcement of the connection will require clamps and welding.

The ROV's (robotic operating vehicles) will use arm to help guide the tapered pipe into the leaking pipe. The preventer has two flanges connected just below the cut pipe that is leaking most of the oil. We will enter into this cut pipe.

## 2. Ram Collar.

The ram collar is located just above the tapered fit location. The ram collar will be big enough catch all of the percussion pipe as they fall down onto the collar.

## 3. Connecting pipe and pipe "percussion stack" will be next up the device.

The connecting pipe will be 21" just as the pipe leaving the preventer. The pipe size will stay 21" all the way to the ship. This will prevent the gasses from expanding and freezing. This is why two of the BP strategies were not very successful.

The percussion pipe stack will be located on the top of the connecting pipe. This will be 41' high. * This length may change when we know the pressure better.

The percussion pipes will be hung by pin(s). The ROV's will either pull the pin(s) or most likely BP will release them hydraulically. For our demonstration we will simulate the pin being pulled out by ROV.

## 4. Venting section

The venting section will consist of three valves.

 Two will be primarily vents to release pressure during the tapered pipe insertion. We believe they will be approximately 18" on the actual device.

The primary valve will be 21" and connected to and relieve to the ship above.

Once the leak is repaired; BP will be collecting virtually all of the released oil via the primary 21' valve.



LCDR Kevin Carroll

Chief Inspections Division

USCG Sector St. Petersburg

155 Columbia Dr.

Tampa, FL 33606

Lieutenant Commander Carroll (Kevin),

Thank you for visiting with me today to discuss and view our plan to STOP the Gulf oil leak and for taking the time to look at our model. I'm sorry that you could not attend our 3:30 demonstration so you could get the full effect. I will send you a video later. I hope you will add to our package. A visual is worth a thousand words so I hope you view it.

Time keeps clicking away; I see the Gulf of Mexico dying and people's lives destroyed.

Lately; it seems everyone is focused on cleaning up the oil; as well they should. It also seems everyone is satisfied with the oil continuing to be released into the Gulf of Mexico. As we discussed today; BP projects much improved recovery and that the relief wells will soon solve everything.

I am hopeful; that for once, their projections will be valid. I look with great caution at their projections.

I can fix the leak in a week or less. I realize this is a bold statement. It seems nobody has an idea how to stop the leak or they have given up on stopping the flow.

I have a "Simple Solution".

I'd like someone from BP look at this and give me their opinion.

I am not an engineer; but I hire engineers. I've been in the petroleum business for 35 years; my dad was in the business for 38 years and my son has been in the business over 10 years. I say that so it will give you a little confidence that I "might" know a little about these things.

I also need to tell you that my experience in petroleum; does not transfer to Exploration or drilling.  They are different worlds and I don't want to pretend that I know the drilling part of the business.

A leak at 5000' underwater is something like 177 "atmospheres" different than the atmosphere we are standing in right now.  The pressure down there is something like 2600 PSI.

The depth and water, temperature and pressure are obviously causing BP great difficulties.

**We believe we have a way to stop the flow of oil into the gulf and save the well for BP.**

We plan on STOPPING the big leak on top of the "preventer"



EXHIBIT

C

Our plan is based on simple physics. At 5000' deep "simplicity" is the key.

We designed this to use the principle of "taper wedge fit". It's a "wedge" that is used in piping.

If you're in a bar, put two of the stainless steel "shaker" glasses ; one inside the other and tap them together with a hammer and see how hard it is to get them apart.

We plan to drive a "tapered pipe" into the hole/leak and percussion pound it in. We will be relieving the pressure through our device using a couple open "vent" valves and open valve to the ship above.

All lines except the taper fitted pipe will be 21"O.D. The taper pipe will be 18"-19"O.D. at one end and it will be inserted into the preventer as far as we can get it.

** (BP will need to figure this out. We don't have that information. The farther we insert the taper pipe in the better. If we can get into the preventer 21' it would be perfect. ) We can work with much less than 21'

The depth of the entry into the preventer must be known or estimated closely. When the depth is known; we can set the "tapering" of the pipe at that length. The taper will be less than 1% which is perfect for a "taper fit". One degree will get the best "fit" possible. The insertion pipe will taper up to the 21' pipe and stay that size all the way to the ship. We are doing this to prevent the freezing of the expanding gases released by the well. This has been a problem for BP all along.

We will "percussion hammer" the tapered pipe into the leaking pipe using several pipes that will be released and come down one by one onto the "Ram Collar" located at the top of the tapered pipe. Each pipe will be one size bigger than the next; each falling around each other. Each pipe will hammer down on the taper pipe to achieve a "taper fit". Our model is built to 3/4 "scale. The actual unit will be at least 52' high. The size will depend on pressure to overcome and the percussion pipes weight.

Above the tapered pipe will be a cluster (probably 2- 18" vent valves and one 21" valve to the ship) two venting to the gulf and one venting to the ship above. All will be open and when the leak is closed at the preventer; there will be oil coming out of the vent valves until they are closed. Once closed all the oil will be going up to the ship. The venting will relieve most of the head pressure for easy entry into the preventer. We have assumed certain conditions in our plan and model; yet we don't know what type of pressure we're dealing with. Obviously this is critical.

The "vent valves" can possibly be used later by BP to seal the well with mud and concrete.

**BP engineers will calculate the pressure and recommend the venting sizes. We have calculated two 18" vents.

It's important to prevent the gases in the crude to expand as it has on BP's two previous attempts. We are keeping the piping the exact same dimension all the way to the ship except for the tapered pipe section. It will be 18-19" at the penetration point and taper up to the original 21". .

This will all happen fast and **will stop the leak and save the well for BP.**

I know you mentioned a possible concern about how much pounding the preventer and the pipe casing can take. I think that's a valid concern but I believe both can take this percussion. Bp will know right away.

This entire event can be done in one week or less.

**Information concerning conditions such as the following will need to be factored in by BP:

Pressure of crude/gases coming out

Differential pressure between the atmospheric pressure and the pressure coming out (we believe the water pressure is around 2600 PSI)

Depth we can get inside the preventer.

Can the robots weld this after stopping the leak? We think they can and we intend to weld if possible.

We don't expect the robots to weld a perfect bead but we expect we can strengthen the connection as much as the robots can do.

We believe that whatever the conditions; we can overcome them. It's just a matter of weight and percussion over pressure.

All pipe will be coated with Teflon to reduce drag.

Plans for stabilizing the well after stopping the leak are underway. We'd like to strengthen the well to prepare for hurricanes.

Thanks again Kevin

Regards,

John Laing


John F. Kennedy said,

"There are risks and costs to a program of action. But they are far less than the long range risks of comfortable inaction"

 **Horizon Support** <Horizonsupport@oegllc.com>

06/28/2010 06:59 PM

Please respond to <Horizonsupport@oegllc.com>

To   <john_laing@murphyoilcorp.com>
cc
bcc
Subject   Horizon Call Center - your recent submission

Dear john liang,
Thank you so much for taking the time to think about and submit your proposed solution regarding the Horizon incident. Your submission has been reviewed for its technical merits. A similar approach has already been considered or planned for possible implementation. All of us on the Horizon Support Team appreciate your thoughts and efforts.


Sincerely yours,
Horizon Support Team

*Doc Provided*
*By Client*

**EXHIBIT**
**D**



www.CurryLawGroup.com

TELEPHONE: (813) 653-2500
FACSIMILE: (813) 689-0242

February 18, 2011

BP
Mr. Lamar McKay
Chairman and President
501 Westlake Park Boulevard
Houston, Texas 77079-2696

CLIFTON C. CURRY, JR.

C. COLE JEFFRIES, JR.

DANIEL W. KING

KENNETH R. MATHEWS

**Re:   Compensation for Development of Deep Water Horizon
          Containment Plan Submitted**

Dear Mr. McKay:

Curry Law Group, P.A. represents John Laing with regard to his claim for compensation for the development and plans submitted which ultimately were utilized to contain the flow of oil from the Deep Water Horizon oil well. Mr. Laing has not heard anything from your office regarding compensation for the plans submitted and therefore has retained our office regarding this matter and wishes to begin negotiation as to the value of the information and plans submitted.

It is clear that the ultimate containment was developed by Mr. Laing and his colleagues. We would like to conclude this request for compensation without the necessity of filing formal claims and look forward to meeting with you for the purpose of resolving this matter.

Please advise of your position.

Sincerely,

Clifton C. Curry, Jr., Esquire

LAVIVA PROFESSIONAL CENTER
750 WEST LUMSDEN ROAD
BRANDON, FLORIDA
33511-6217

REPLY TO:
POST OFFICE BOX 1143
BRANDON, FLORIDA
33509-1143

CCC/lcd

cc:    Mr. John Laing

G:\Wp10\34\Letter to BP_Laing.wpd

**EXHIBIT**

**E**

www.CurryLawGroup.com

TELEPHONE: (813) 653-2500

FACSIMILE: (813) 689-0242



January 18, 2013

P.O. Box 330919
Houston, Texas 77233-0919
Phone: (855) 687-2631
Fax: (866) 542-4785
E-Mail: bpclaimsprogram@bp.com
Website: www.bp.com/claims

CLIFTON C. CURRY, JR.

DANIEL W. KING

LOUIS D. LAZARO

Re: Deepwater Horizon, MDL No. 2179, John Laing's
Presentment under the Oil Pollution Act. 33
U.S.C. §§ 2701(3) & 2713 (2012).

BP Claims Program:

Our firm represents John Laing in the above matter.

Pursuant to the Plaintiff's Steering Committee letter
dated December 13, 2012, styled In Re: Deepwater Horizong,
MDL No. 2179, and the requirements of 33 U.S.C. . § 2701(3)
& 2713, presentment is hereby made by demand for
$146,186,315.00 per day (U.S. currency), calculated from the
inception of the oil spill and continuing so long as Mr. Laing's
invention is used now and into the future.

The following is a written description of the claim. Mr.
Laing invented and designed the technology which eventually
stopped the Deepwater Horizon oil leak. BP used, had someone
else use, or benefited from the use of Mr. Laing's invention
which was used to stop the Deepwater Horizon oil leak. The
above per diem amount demand includes $3,710,000.00 for
53,000 barrels of oil at $70 per barrel per day. $131,578,947.00
for the cost of oil spill with regard to $20 billion damage fund
of BP. duration from April 20, 2010 to September 19, 2010 or
152 days, for a subtotal of 20 billion divided by 152 days or

LAVIVA PROFESSIONAL CENTER

750 WEST LUMSDEN ROAD

BRANDON, FLORIDA

33511-6217

REPLY TO:

POST OFFICE BOX 1143

BRANDON, FLORIDA

33509-1143

Page 1 of 2



EXHIBIT

F

$131,578,947.00 per day. $10,897,368.00 pursuant to enclosure 1 to GAO-11-90R November 12, 2010, page 22 of 57 pages, provides for funds from the oil spill governmental trust fund not covered by BP of $1656.4 million (this includes cost of governmental agencies, those paid and not paid by BP) [see also $581 million total costs for 152 days of oil spill, April 10, 2010 through September 19, 2010, or $1,656,400,000.00 divided by 152 days for a subtotal of $10,897,368.00.

This claim is per diem in the amount of $146,186,315.00, calculated from the inception of the oil spill and continuing so long as Mr. Laing's invention is used now and into the future. Claimant's causes of action include, but are not limited to, the following:

1. Unjust Enrichment.
2. Violation of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), Florida Statutes §§501.201 et seq.
3. Violation of Florida's Uniform Trade Secrets Act (FUTSA), Florida Statutes §§ 688.001, et seq.
4. Negligent Misrepresentation
5. Breach of Implied Contract
6. Breach of Confidential Relationship
7. Equitable Fraud
8. Civil Theft

This claim also includes any other use of Mr. Laing's invention anywhere and by any person or entity. Mr. Laing reserves the right amend this claim.

Please find enclosed supporting documentation of this claim.

Sincerely yours,

Louis Daniel Lazaro, Esquire on behalf of
Clifton C. Curry, Jr., Esquire

/Enclosure
LDL/jlb

cc: Client